Thank you. Would the lawyers, both lawyers, who are going to address the court please give us and spell your names, starting with the appellant. I'm James Castelli-Renner, C-O-S-T-E-L-L-O-N, middle initial is T. My son is James A. Good afternoon. I represent First Chicago Insurance Company. My name is Cynthia Ramirez, C-Y-N-T-H-I-A-R-A-N-I-R-N. As you both probably know, you each have 20 minutes. You do not need to use it all, but you are welcome to it. Mr. Castelli, do you want to reserve any of that for rebuttal? Yes, ma'am. Okay. Whenever you're ready, you may sit down and you may proceed. Thanks, Your Honor. I'm just going to run a hypothetical past the court to begin with, and I think instead of doing that, what I'm going to do is talk about the case. It's a duty to defend case, right? Not whether or not there's coverage. It's just duty to defend. It is, Your Honor. It's duty to defend and among other things. The case goes to use. Use was defined in the Shultz case as one uses a vehicle. This is the Shultz Supreme Court when they were recording the Jacquez case from New Jersey, and they said one uses a vehicle whenever such use is rationally connected to the vehicle for purposes of, one, providing transportation, or two, satisfying some other related need of the user. So you'd ask, what is the business of NPTL? It's transportation. What is it or who is it that they transport? They transport human beings. What kind of people? They transport all sorts of people. Handicapped people, those who are not handicapped. They take veterans from their homes to the hospitals and so forth in particular. What was being insured under this contract? It was injuries resulting from the ownership, the maintenance, or the use of a livery vehicle. So on the day of the occurrence, what was, and this is a question I came with before just getting ready for today. Does the policy specifically refer to livery vehicles as opposed to vehicles? Well, if you look at the vehicle, Judge, this is a, the kind of vehicle, and this is for Chicago's wards, not mine. They said this is a commercial vehicle. Give me a second, I can get it to you, but I believe it's a commercial vehicle, hyphen, taxi, and livery or something like that, but it was used specifically, and again, that was the words used by, for Chicago. The question that popped in my mind is when was the business of transporting Ron Dixon over on the Dayton question? When was their job done? And if it's a matter of a taxi, and I pointed this out in my brief, it's simply a taxi, it's curb to curb service. You hail a taxi, you pick it up, you go to wherever they want to take you, and you get out the curb and you go on your merry way. If, on the other hand, it's a livery service used for people who are both handicapped and not handicapped, which includes Ron Dixon, you pick him up from the door, you get him into the livery vehicle, you take him wherever he's going, you don't stop at the curb, though. You don't say, Ron, go about 20 yards that way. You must stick out your hand, your arm, your left arm is a rule, and you walk the rest of the way. It's a job of transportation. I want to repeat transportation, because that was the word that was used in the Jacquez case, cited by approval by the Supreme Court in the Shultz case. Counsel, can you talk about what's in your policy about loading and unloading? Loading and unloading, there were four provisions in it. I'm going to screw this up. But there was a part in there where they talked about – give me a second, Judge, I'm sorry. But there was something in there about loading and unloading. There was. But it talked about property, not persons. Is that right? True. But it's 1B4, it said, non-employees are not covered for moving property from an auto to or from a covered auto inference. If you are an employee, you are covered. It said the user is not covered. The other user of the vehicle is not covered. No, it says non-employees are not covered. Implication is those who are employees would be covered. It's not stated, especially though, and I want to make that clear, I'm not saying that. But if you look at B7, another exclusion, handling property before it's moved from the place where it's accepted by the insured or after it's moved by the insured from the covered auto to where it's finally accepted or its property doesn't include human beings, so be it. The logical inference, though, is this is transportation and we're talking about use. Then you're talking about where you're picking things up and where you're going to. This is a livery service. That's what's going on here. And what they're saying is we include all of that. So let's assume this is a person who is a user sitting in the back seat, wherever, and the driver takes his luggage and hits him with it on the way in or whatever, falls on him with the luggage. Does that make any difference with the scenario? I don't think it should, but it seems like it does, doesn't it? My point of that, if they had ripped somebody's suit, well, we're going to cover that. Or if somebody walked in with a walking stick and it tripped somebody, that would be covered because that's property related, whereas if it's a human being, that is what the argument was made. But again, my point is it's kind of a combination of carrying his luggage and assisting him. So are you covered for the damage to the property and not to the person? I don't see how you could because if you're covered and you're covered for anything that happens from negligence, basically, as I understand it, Your Honor, having read the policy several times, but I don't want to tell the court something that's not accurate either. You asked about the provisions, the specific provisions. Provision B-10 will exclude from coverage any bodily injury arising out of your work after the work has been completed or abandoned. So it's after that work has been completed or abandoned. The implication, well, if it's still during the course of the work, and the work here is that of a livery service or a taxi driver, here it's a livery service, their work was transporting Ron Dixon from here to there. Ron Dixon is blind and he needs to be transported from his door to the door of the, wherever he's going, which here is the highest VA hospital. And again, that doesn't say, oh, we're going to include it. It says to exclude that. The only inference from that, the only logical inference, I think the only fair inference, is that it's included. And then there's 2B-2. It's operations under 3 types of certain insured contracts are excluded, and it goes into that. The inference I drew from that was that, well, if that's excluded, then include would be what they're doing here. So essentially you're relying on the fact that there's no exclusion for loading and unloading, and there are these other exclusions that suggest that loading and unloading are included. Right. And the rule of thumb is that I need not exclude that which is not included. Why specifically exclude that which is not included, you know what I mean? And it's pretty clear to me, anyway, reading through this, a fair reading is that. Look at this compared to the Commercial General Liability, the CGL, and there it is. There is an exclusion that excludes. Wow. It's crystal clear there, too. And I'm going to get out of Ron Dixon's shoes for a moment and get into NPTEL. So you're buying this coverage, and the one says we're going to exclude this. And the other one is silencing us to that issue, and it's an auto coverage. What would you infer? I think the only fair inference is you're covered for this. NPTEL is still, in this case, no you're not. You know, and there they are. Well, counsel, what was contemplated between the parties when they negotiated this insurance agreement? I mean, they claimed that there was an outside agreement that covered, you know, between the. . . They would walk the person to the door because of the agreement with the hospital, right? Right. And that was mentioned at page 5 of the judge's, the trial court's order. There was a provision in there, Your Honor, that said you look at the contract, the actual contract, and I'll be doggone if I screw this up, too, but there was something in there that referred specifically to the fact that it was covered. But you look at that contract, and it's in there. I can. . . I'm sorry, I don't have it. But it was referred specifically in that contract, in the insurance contract. In terms of what was contemplated between these specific parties, I think that's where you look at, whom are they selling this stuff to? This isn't a 2040 Safeway policy sold to some guy that can pick up a thing on TV. It's a commercial enterprise. Is that where the inquiry stopped? No. They were doing this commercial policy for a fleet, not just one car, a fleet, having to do with taxis and livery services. Livery being the operative word here. I don't know if you're following it, but livery being transporting human beings. And it's not just curb to curb. It goes beyond that to door to door. And that was for Chicago to use that designation. It wasn't NPTL. You're talking about the designation on the policy. They call this the policy for personal taxi and livery. Is that what you're relying on? Yes, they call it that. And also, when you look at the designation of what kind of policy it is, it says commercial hyphen taxi slash livery, I want to say. That's in there also. Counselor, in the court's order, they denied your motion for summary judgment. In the court's order, in the trial court. Yes. I'm sorry. What the trial court did in denying one motion for summary judgment and granting the other. What I'm concerned about is the argument on appeal. Do you argue both sides of that? You know, at least in my own question, in my own mind, was do we have jurisdiction, and I talked to counsel about that. That's a good question. I'm glad you all are raising it. I'm sorry for saying that. Because the notice of appeal only appeals, hand it in front of me, the granting of summary judgment. The notice of appeal doesn't say anything about denial of the other motion. Is it all the same order? Did she deny yours and grant? It was all one order. And then the other question I had was the other two parties who were defaulted, was that part of the, in terms of jurisdiction, because the court had it in the absence of 304A language. I thought that it did. Counsel and I talked about it. We assume that the court does. I'm not sure. I saw one Rule 23 case, and I'm not going to cite it because, you know, I heard you're not supposed to do that. Yeah, that's right. Yeah. And that was no, because I won. That was the best I could come up with. Because you argue it in your briefs, but the opposition does not talk about it. As far as what, ma'am? As far as a prayer for relief. I mean, only regards to their one motion for summary judgment, not the other one. I will tell the, the Shultz court, the Shultz case was not decided in the original motion for summary judgment. I wanted to get the last word, so I did a cross motion. I wanted to talk just briefly, if I might, getting back. And I think the case is, Justice Harris, it's your case on Kim v. State Farm. That's the one that really controls this because that's the one that says there is an oscillating light at work here. That's the 2014 case, oscillating lights. Is that actual use of a vehicle? And I thought it was. But if you look back at the Shultz case, they talk about providing transportation, which is our case, or satisfying some other related need of the user, which was the Kim case. Here we're talking about transportation. Again, my thought would be this is kind of a corollary to the Kim, the holding of the Kim case, where if you're following strictly the JACA slash Shultz rationale, which is what this is about, this is the modern trend that we're following. You'll recall the Supreme Court cited in Shultz in that footnote the Amjur citation, and they go through the whole list of cases excluding Ohio, but all of those other jurisdictions were following the New Jersey series of cases, you know, JACAs and so forth. The Kim case, and it noted, I thought paragraph 21 there said just about everything I wanted to about the cases cited by First Chicago. It differentiates and says all those other cases that were pre-Shultz really don't apply here because they evolved, you know, intentional towards things along that line. There is a 1942 case from the 4th District, and I'm thinking it's, you know, 75 years old. I don't think of it as a binding precedent in this jurisdiction, certainly. And it's on the other side of our case in Kim, the Menard case from the 3rd District, and I think it's the Tober case out of the 5th District. So we have three other jurisdictions which follow the more modern trend, which is Shultz and so forth. You look, and I want to make a point. If First Chicago wanted to say use is defined thus and so, fair enough. If they want to exclude the transportation of people, fair enough. That would be explicit, and they chose for whatever reason not to do that. Note the CGL policy they did, whatever that insurance carrier did. But here these folks decided we're not going to put that in, which would have solved this question, and we would know from the get-go. Well, they could have excluded loading and unloading. Sure. Is that what you're saying? Absolutely. They could have, and they could have. It's a liberty service to which they're selling this policy. And that wasn't done explicitly. Counsel, let me ask you. If we reverse this, are you saying that we should order there's a duty to defend and to indemnify? I think if we get to that point, yes, I think that's appropriate. And the reason I would say that, Your Honor, is because it's the use connotes what exactly was going on with Ron Dixon and Juan Rangel. Is there a difference between, you know, defending and indemnifying? It depends. I mean, as I understand it, and I'm not a coverage guy, but as I understand it, Judge, it's the four corners of the policy, of the complainant law, rather. If that says, yeah, this is covered activity, then you have to cover it. Whereas if you go beyond that, then you're going into the indemnity provisions. As I understand it. To defend it would be even if it potentially falls within the coverage. Yes, ma'am. But indemnify is to when it actually falls within the coverage. Right. And I would think here this would fall within the coverage. And I'm arguing the common law of this State, Schultz and Kim in the Menard case. The Menard, I get the fact that they had a kind of drape in it. I'm not running around that. But if you look at the paragraph just in front of that, they were talking about Schultz. But Dixon hasn't proved up his liability yet, has he? We're stuck in M6 right now. We're waiting for a ruling by this tribunal, frankly, and then we'll take it from there. We're on hold because they no longer have MPTL or Ron Rangel no longer have counsel. Got it. They're not. They're defunct. They're on their own. Well, Ron Rangel is a live human being, and he has no coverage on their counsel right now. So we suggest it to M6, the Law Division M6. Right. That this case is pending. Right. Let's put this on hold. What I'm saying is the duty to indemnify is premature at this point. There hasn't been a finding of liability. It is. What's at issue right now is the duty to defend. Exactly so, Your Honor. Thank you. I think. No, you're right. First things first. Thanks for the chicken and all that. They're saying that this took place outside the vehicle. And I'm thinking if you look at the Kim case and other cases, too, the minor offense, you know, what is the activity? What is the use that we're talking about here? And that's where, in my opinion, that's where this case, along with the modern trend, comes in. And, indeed, this should be covered under the common law of this state. Here's the hypothetical I was going to run past at first. Let's assume that, Ron Dixon, there was a gadget that would allow people. You could turn the gadget on, and blind people would be able to find themselves from a vehicle to whatever place you wanted to take them to. It was a beep, beep, whatever the heck it was. And that thing didn't work. Wouldn't that be comparable with the oscillating light in the Kim case? You know, in the Kim case, the oscillating light was part and parcel of what this vehicle was doing. That gadget would be part and parcel of what the vehicle was to be doing. The difference here is you can't. There is no such gadget. You need a human being. That person is a livery driver, and that was Ron Rangel. So it was his job, as part and parcel of transportation, was to transport Ron Dixon from the livery vehicle to the hospital entrance. That was what he was doing. That was part of the transportation process. And that job for Ron Rangel was not over until they got to that hospital door. I talked about the contract. First, we look at the explicit, which is missing in the action. There was not any defined use. There was no specific exclusion for this activity. So one might assume that this is part of what we're doing. And then you look at the exclusions, and they're kind of like the Nancy Day at the Kimmel. You've got one, two, three, four provisions which say, Well, this is excluded, that's excluded, this is excluded, that's excluded, but not one word about transporting human beings in a livery vehicle. It's not just blind people. It's people like my mother, older people. It's like 65-year-old women with bad hearts where we can't lift as much as we once did, and you need help with a suitcase. What a livery driver does is to take the suitcase, come in, and maybe you're going to trip them a couple of bucks. That's part of the job. That's part of what a livery driver does. If you would like to stay five minutes, then you're 15 minutes. Well, I will sit down right now, then. Thank you, Your Honor. Thank you. May it please the Court. The circuit court correctly rules that the injury at issue did not result from the ownership, maintenance, or use of the insured vehicle. The coverage that's provided under the first Chicago insuring agreement is not endless. There has to be a causal connection or a nexus between the injury and the insured auto. And to that end, the causal connection has to end at some point. Here, the complaint alleges that Mr. Dixon walked into a cement puller. Just because he happened to be in a vehicle before the accident occurred does not mean that his injury was related to the vehicle. But it was definitely related to loading and unloading the passengers from the vehicle. With respect to the loading and unloading argument that opposing counsel makes, I would like to say that in situations where unloading and unloading comes into play, the insuring agreement specifically contains a loading and unloading clause. Well, sometimes, yes. Sometimes, no. I mean, I do think that there's no case in Illinois that says if it's silent, you necessarily imply loading and unloading. But there are cases in other jurisdictions that say that. Yes. Well, there is one case that does say that an unloading and unloading clause expands the scope of activities included within the use of a vehicle. That's the Estes v. Employers Mutual case of the Supreme Court case from 1980. The inference there is that if there is no unloading and unloading clause, then the insuring agreement is limited. And one of the cases that I do cite in my brief does mention that the risk that is to be insured in an auto policy is the risk of automobile accidents and not all accidents. You know, in this case, the causal connection ended. And as Your Honors did mention earlier on, here the issue is the duty to defend. The First Chicago's duty to defend is determined by an examination of the insurance contract in comparison to the allegations within the four corners of the complaint. Here, the complaint can be found on page 280 of the Record of Appeal, expressly states that Mr. Ranhell and Mr. Dixon had already exited the vehicle and were making their way to the main entrance of the medical facility. The complaint further alleges that while escorting plaintiff Ronald Dixon to the main entrance of the medical facility, the defendant, my personal taxi and livery, by and through its duly authorized agent, servant, and employee, defendant Juan Ranhell, caused plaintiff to walk directly into a cement pillar. Those allegations simply are not related to the vehicle. Okay, I'm going to go back to loading and unloading because I think this is all going to rise and fall on that. And I think you can't get away from it quite as easily as you are. The Supreme Court in Charles specifically cites Traveler's Insurance Company versus Aetna, which is a Tennessee case, and that case specifically says that the general rule is where a policy fails to specifically mention loading and unloading, those terms are within the general catch-all term use. So there's some implication from our Supreme Court that we're supposed to read loading and unloading into these policies when they say use unless it's excluded. And then your opposing counsel has come up with a bunch of exclusions which sort of underscore that even if we don't read that in all policies, we should read it in this policy because of all the things that are excluded. So we all get that there was no driving involved here. We get that. But why wouldn't we say that the policy includes loading and unloading? Or if we did say that, why wouldn't this be covered? Unloading and unloading clauses, if that were to be inferred as part of the insuring agreement at issue, applies to property. The loading and unloading cases that were cited by opposing counsel all involved property. Are you familiar with Constitutional Casualty Company v. Soder, which is an Illinois case which says unloading includes children? I am not aware of that one. I mean, what these people transported was people. They didn't transport coal and they didn't transport cows. They transported people. That's what they transported. That's who they loaded and unloaded. I mean, maybe there is, but is there a law that says loading and unloading doesn't include people? I'm not aware of any. What I am aware of is the case that I did cite that mentions that the insuring agreement limits the risk to automobile accidents and not all accidents. So at some point the causal connection is too attenuated, too remote, and it brings it outside of the coverage of the insuring agreement. Absolutely. That absolutely has to be true. The question is how far out is that line, and does that line include loading and unloading, and if it does, does it include people? I mean, of course, there has to be a limit. Of course. Exactly. So, for example, had Mr. Dixon been escorted into the medical facility, and instead of walking into some color outside the facility, he walked into the reception desk? I don't think they would have that. That to me would be too remote. So the fact that he's inside the facility versus outside does not make a difference. At some point the causal connection must end. But isn't there a potential here that there is a causal connection? I mean, that's what duty of defense says. There has to be a potential, potentially fall into the terms of the insurance agreement. But there still has to be a relation between the injury and the auto. There has to be something inherently, you know, it has to be consistent with the inherent nature of the vehicle. Walking into the cement pillar does not fall under that criteria. So, for example, I believe there is one case, although it's an uninsured motorist case, so it's not directly applicable here, but in that situation the driver ran out of gas, walked out of his vehicle, and then went to go get some gas to fill up his vehicle. In that situation the court found it was a use within the uninsured motorist coverage of the policy because it was inherent with the nature of the vehicle to go and get some gas. That's not the situation here. But the facts of what were testified to by the person riding the car, does any effect on this whatsoever as far as his statement that the driver may have slipped and then slung him into the concrete pillar? Pardon? Does it have any influence on this at all? Not at all, Your Honor. And, in fact, I think that fact scenario goes more in favor of finding that there is no causal connection here because, again, that's not related to the vehicle. Your Honors, the three cases that I cite in my brief in support of my argument, those cases all interpreted the identical language that's found in the For Chicago Insurance Agreement. They all apply the same causation analysis. Those cases all- Did they have the same exclusions? I don't believe those courts addressed that. What I do know is that those cases did not have a loading and unloading clause within the insuring agreement. And those cases involve situations inside and outside of the vehicle. So even in cases where the injury occurs inside the vehicle, if it's attenuated from the use of the vehicle, it will still be found to fall outside of the coverage of the insuring agreement. And that's the State Farm v. Beale case that I cited in my brief. In response to the arguments raised by opposing counsel, the policy that was issued is generally named a business auto policy. So if you look at the provisions of the policy, it generally refers to a vehicle or an automobile. Additionally, to distinguish the cases that he cites, those cases involved specific insuring agreements that contained the loading and unloading clause. The Tolar case and the Mortnard case that he cites both had specific unloading clauses within the insuring agreement. Opposing counsel also cites to the Kim case, that situation is distinguishable because there was an actual use of the vehicle. The claimant in that case was using the vehicle's oscillating yellow light as a warning to other drivers. There was an actual use. In this case, the vehicle was not being used anymore. Both Mr. Randhau and Mr. Dixon had completely exited the vehicle and were on their way to the entrance of the medical facility when the injury occurred. Shultz's case is distinguishable. That case involves a U.M. case, and the issue there was completely different than the issue in this case. In that case, the court had to determine whether a permissive occupant was entitled to uninsured motorist coverage. And in no way am I arguing that that isn't correct. And in fact, the trial court did say that the ruling in Shultz is sound and it doesn't change the fact that in this case the causal connection was not there. Additionally, I do cite to a case in my brief that says when there is a taxicab, a livery company, a common carrier, there is no special duty that is imposed to its passengers simply because the insured is a common carrier. That's a Jiffy Cab case that I cite to. So similarly, in all those arguments, I would respectfully ask that you disregard those because the duty is not greater simply because we're talking about it. But how about the fact that your contract, because I agree, you're not a part of their contract, but you do have your own contract with them. And your contract says that you exclude bodily injury arising out of your work after that work has been completed. And then you define completed work as when all the work called for in your contract, and that has to be a reference to their delivery company's contract, has been completed. So you've kind of incorporated their contract, it seems to me, into your contract a little bit, no? Well, one, the exclusion refers to handling the property, and again, that is personal property and not persons. Secondly, I don't believe we even get to the exclusions. The burden is on the plaintiff to establish that there is coverage under the insuring agreement, first of all. And once that is done, and I argue that that has not been done, then you would get to the exclusions. Don't we read the exclusions? Don't we look to the contract as a whole in order to understand what the contract means? It certainly is. Including the exclusions? They're not relying on the exclusions. They're just saying the exclusions inform us as to what the inclusions mean. That's all I think they're saying. Okay. What's your response to Justice Conner's question about, do we have the authority under this appeal to not just reverse and remand, but also to reverse and grant summary judgment to the? No, but to grant summary judgment on the indebted. Well, that's another question. Do we have authority to grant summary judgment to Mr. Dixon? Is that encompassed in the appeal? I don't recall what the notice of appeal says, but if it does say, as Justice Conner has mentioned, that the appeal is only asked to the granting of my summary judgment motion, then the ruling should be limited to what he requested. Even if it's all the same order? Or you don't know? I don't know. I can't decide. But you didn't even ask for it or discuss it in your briefs. I did not, yeah. And what about, do you agree with Mr. Dixon that indemnification is not in front of us? What we're really looking at is the duty to defend because there's been no binding liability. My understanding of that is that the duty to defend is broader than the duty to indemnify. So I would argue that if there's no duty to defend, then there's no duty to indemnify. Of course there's no duty to indemnify. You're absolutely right on that. But I'm saying before us right now is only the duty to indemnify. Is that correct? The duty to defend. I'm sorry, the duty to defend. I'm so sorry. Well, you're right. But, again, I am arguing that we don't get past that because the duty to defend is broader. So if Your Honors affirm the judgment there is no duty to defend, then by extension there is no duty to indemnify. Again, if we say that this is a proper use or definition of use under the insurance provision, if we say there's a duty to defend, that doesn't necessarily mean there's a duty to a libel, right? Or to indemnify. Correct. Yes. Okay. Good. Well, Your Honors, if there are no further questions, then I'd like to stand on my brief with respect to any other points that were not orally argued, and I respectfully request that you affirm the judgment entered by the Circuit Court. Thank you. Thank you. I have to tell you, you caught me short of it. That was an appeal question. I had no idea what was going on. I'll just tell it. Can I sign this? This is on me. But I did say we ask that the appellate court reverses, should have been reversed, the aforestated order. That order was, that's what I was talking about. And in that order, that's the one where Judge Gamerat, if you look at, I can't remember what part of the record, it's page 5, where she goes through both of the orders. That's what she's denying. I think the court has jurisdiction, is my point. There's a question about whether Ryan was loaded into the hospital into the proper. There's a person at Heinz VA who greets all the blind veterans, so that's why they go door to door, and so that's a non-issue as far as that goes. He's not just wandering around the halls, is my point. Counsel mentioned the nexus. I'd like to point the court to paragraph 21 of the Kim case. State fund disagrees, arguing that Illinois law requires that a causal connection or nexus must exist, and it goes on from there. You can read that as well as I can. I think, Justice Harris, you pointed out and you dealt with that, and paragraph 21 would be my response to that. I think I mentioned that I'm not a coverage guy when I was talking to the court, and I will tell you this, I've never heard of a Continental Casualty Company case, nor did I hear about the travelers case. I wish I had because I'd argue them. Me too, especially the part about including children. Children are covered by implication. Why? Because you don't know what kids are going to do when they're in your car and they jump out and so forth. With adults who are blind, there are other issues, but certainly the rationale behind that applies here. There is a reference in counsel's brief to the fact that Ron mentioned that he was slung into the concrete pillar. I think, Justice Carr, that was your question, if I might. This is from the perspective of a blind man since May the 16th of 1986. This is how he perceives the world. Things were different for him, perhaps, than it was for Ron Rangel. Somehow, someway, there was contact made between Ron's head and that concrete pillar. That's not in dispute. And so whether it was slung or there was a crash or simply a collision, it really doesn't matter. I would respectfully suggest to the court that that's not something that you want to rely on too much, given the person who was giving his best observation. Justice McCoy, you did pick up on the fact in our brief, I think on our reply at page 10, we talked about the relevance of the VA contract. That was dealt with specifically, and I'm going to stand on that. And then as far as whether this is fore-indemnity, you know, it's an interesting question, because I always figure I'm going to win in any case I file, otherwise I don't file. But you haven't won this case. You're right. I understand that, too. And that's putting the dog before the mouse. Anyway, you're right. This is a duty-to-indemnify case at this stage of the litigation. Duty to defend. Yes, ma'am. Don't make my mistake. I think that was the first question I asked. You did. You did. I just assumed I was going to win the case before it belongs, so that's all I have to say. And, you know, this has nothing to do with my time at all, but I was telling counsel, we rarely get oral arguments anymore, and I do appellate work, and we rarely get them, and it's always fun because it makes you sit and think the hypothetical and all that kind of stuff you're thinking about. It's just something I appreciate your taking the time. Thank you. Well, thank you. Thank you both. This was very well briefed and well argued, and you will hear from us shortly. We are now in recess.